<u>FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DAVID MEYERS, | : | |
| | : | Civil Action No. 03-5538 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | OPINION |
| GWIN DREDGING & DOCK, INC., | : | |
| a New Jersey Corporation, and | : | |
| DAVID GWIN, | : | |
| | : | |
| Defendants. | : | |

**Appearances:**

Salvatore Perillo, Esquire
Perskie, Nehman & Perillo
PO Box 730
Somers Point, NJ 08244
    Attorney for Plaintiff

Richard D. Picini, Esquire
Picillo Caruso O'Toole
371 Franklin Avenue
PO Box 510
Nutley, NJ 07110
    Attorney for Defendants

**RODRIGUEZ, Senior District Judge:**

This matter has come before the Court on Defendants Gwin Dredging & Dock, Inc.'s ("Gwin Dredging") and David Gwin's ("Gwin") Motion <u>in</u> <u>Limine</u> [12] to exclude that portion of the expert testimony of Dr. Roger Farber ("Farber") that relates to the

1

causal link between trauma and the onset of ALS. For the following reasons, the motion will be granted.

## PROCEDURAL HISTORY AND BACKGROUND FACTS

This litigation arose as a result of an accident which occurred on January 17, 2002. Plaintiff David Meyers ("Meyers") was developing a property, and retained Defendant Gwin Dredging to dredge a lagoon. Defendant Gwin, the President of Gwin Dredging, was operating the dredge on the lagoon, and invited Meyers to it. He waited inside the pilot house when Meyers came onboard. Meyers climbed onto the dredge, walked to the pilot house, opened the door, and fell through an open hatch, sustaining serious injuries. The two foot by two foot hatch and cover had been installed by Defendants after they purchased the dredge.

Meyers intends at trial to present Farber as an expert who will testify that there is a causal relationship between the trauma Meyers suffered as a result of the accident and his development of amyotrophic lateral sclerosis ("ALS").[1] (Pl. Opp., p. 7.) Defendants argue that Farber's causation theory should be excluded because it does not satisfy the reliability requirement dictated by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), in that it has not been tested; is unsupported by peer review and publication; and is not generally accepted. (Def. Br., pp. 8-11.) Meyers, on the other hand, argues that the opinion is reliable because it is "founded and based upon: [Farber's]

---

[1] Meyers was diagnosed with ALS eight months after the date of the accident.

own personal account of [Meyers's] symptoms and onset of ALS as documented in this matter, not only by [him], but also by Doctor Zager and Doctor Wolf;[his] treatment of [Meyers]; [his] thirty years of experience as an outstanding medical doctor; and readings, general medical knowledge, text books (sic) and other references." (Pl. Opp., p. 9.)

On November 20, 2005, the Court held a <u>Daubert</u> hearing. Both experts agreed that no study has been published that suggests ALS is caused by trauma. During Farber's testimony, he conceded that none of the studies on which he relies conclude that trauma causes ALS. (Def. Concluding Arg., Exh. A, 86:17-20.)  Similarly, Dr. Belsh ("Belsh") testified that none of the studies that he reviewed suggested that trauma causes ALS. (Def. Concluding Arg., Exh. A, 30:10-12.)

## DISCUSSION

The admissibility of expert testimony is governed by Fed. R. Evid. 702. The Rule provides:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (2000). In applying this Rule, the Court has held that the district courts are "gatekeepers" responsible for excluding unreliable evidence. <u>Daubert</u>, 509 U.S. at 597. The Court has stated that "the trial judge must have considerable leeway in deciding

3

. . . whether particular expert testimony is reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). However, the Court has also emphasized that the "inquiry envisioned by Rule 702 is a . . . flexible one," and noted that the "focus must be solely on principles and methodology, not on the conclusions they generate." Daubert, 509 U.S. at 595. The Third Circuit has described the factors as a trilogy, requiring qualification, reliability, and fit. Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003). Only the reliability of McCue's expert testimony is at issue here.

In order to show that an expert's opinion is reliable, "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994) (quoting Daubert, 509 U.S. at 590). See also Oddi v. Ford Motor Co., 234 F.3d 136 (3d Cir. 2000) (citing Paoli, 35 F.3d at 744 (stating that the "test of admissibility is not whether a particular scientific opinion has the best foundation or whether it is demonstrably correct[, but that] the test is whether the 'particular opinion is based on valid reasoning and reliable methodology'")).

To assist the district courts in determining whether an expert's opinion is reliable, the Third Court has provided a list of factors to consider to begin the inquiry. These include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation;

> (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

In re Paoli, 35 F.3d at 742 n.8. This list, however, is not exhaustive. Calhoun, 350 F.3d at 321.

### 1. Studies

Although "trained experts commonly extrapolate from existing data . . . nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). In Joiner, the plaintiff argued, by way of expert testimony, that his development of lung cancer was linked to his exposure of polychlorinated byphenyls ("PCB's"). Id. The plaintiff's experts, relying on several animal studies, opined that his cancer was "more likely than not . . . causally linked to cigarette smoking and PCB exposure." Id. at 143. The defendants argued that the plaintiff's experts failed to show that there was a link between exposure to PCB's and lung cancer. Id. at 140.

The district court excluded the expert testimony, reasoning that the experts' opinions did not rise above "subjective belief or unsupported speculation." Id. The district court found that the studies focused on infant mice that had been given highly concentrated amounts of PCB's directly into their stomachs. Id. at 144. In contrast, the plaintiff was an adult, and had only come into contact with much smaller amounts. Id.

The district court noted that no study had demonstrated that PCB's lead to cancer in people. Id. Moreover, the district court reviewed the studies and found that none of the studies suggested a causal link between PCB exposure and cancer. Id. at 145-46. Of the four studies, two declined to conclude that, although there were somewhat higher incident rates, there was no statistical significance. Id. at 145. The other two studies, which did note statistical significance, did not increase the reliability of the experts' opinions because one did not mention PCB's specifically, and the other involved subjects that were exposed to numerous potential carcinogens. Id. at 146. The Court affirmed the district court, reasoning that it acted within its discretion in excluding the experts' causation theory. Id.

Meyers's argues that a physician is not required to rely on published studies in order for his testimony to be admissible, relying on the Third Circuit's opinion in Heller v. Shaw Indus., Inc., 167 F.3d 146 (3d Cir. 1999). This reliance, however, is misplaced. While it is true that the court held that a physician does not necessarily have to rely on published studies, the court also stated that "some reliable basis for a causation conclusion must exist." Id. at 157. Moreover, the court stated that "there is certainly evidence in the record–from [the defendant's] own records and from reliable studies–that carpets emit [volatile organic compounds ("VOCs")] and that VOCs can cause certain health problems." Id. at 156.

In this case, Farber suggests that there is a causal link between trauma and the

6

development of ALS.  In support of this theory, Farber relies on his extrapolation of several studies.  However, none of the studies that he cites suggests that ALS is <u>caused</u> by trauma; rather, at best, the studies suggest that there may be an association of trauma with the onset of ALS.  <u>See</u> Expert Report of Belsh, p. 4 (stating that "[t]his theory of trauma as a causative factor in the development of ALS was not supported by any of these articles and was not the focus of their research studies.  All of these studies in the literature attempted to look for environment 'risk factors' that might show a statistically significant <u>association</u> with the subsequent development of ALS.  It is a cardinal rule of medical epidemiological research that <u>causation</u> cannot be inferred from <u>association</u>.  None of these articles suggested that trauma, bone fractures, falls, or strenuous jobs or avocations can <u>cause</u> ALS.  Rather, they have studied various environmental factors, including trauma, to see whether any factors might play even a slight role in the development of ALS.")  To contrast, Farber suggests that the causes of ALS range from trauma to the characteristic of niceness.  (<u>Daubert</u> Hearing Trans., p. 95:1-4.)  <u>See also</u> Expert Report of Farber, p. 2 (Oct. 22, 2004) (stating that "the tragedy that has been going on with this gentleman as he loses his ability to function has been met by a courageous man and a very kind, nice gentleman.  This is another factor, by the way, and that is that people with ALS whom I have had the pleasure of trying to help through the years have another characteristic in addition to their leanness and athleticism, and that is they are almost uniformly they very kindest, nicest people whom you ever want to meet.  This is

something that, again, what goes into making up kindness and niceness, and its connection is not known or identified, but it is a clear-cut piece of evidence, as everybody is probably aware of the retirement speech of Lou Gehrig, thanking his fans and letting them know he was the 'luckiest man on earth' to have been allowed to have been an athlete and had the pleasure of performing his athletic feats with this great fan base.  It was the kind of act that you expect from these people.").  However, like the studies in Joiner, the statistical significance of the increase is questionable.  Therefore, the Court finds that Farber's opinion does not rise above subjective belief or unsupported speculation.

### 2. General experience or principles

"Although the reliability inquiry must bend with the particular idiosyncracies of the relevant expertise under consideration, the Court may not abdicate its gatekeeping role merely because an expert relies on general experience or principles."  Milanowicz v. Raymond Corp., 148 F. Supp 2d 525, 532 (D.N.J. 2001) (citing Watkins v. Telesmith, Inc., 121 F.3d 984, 991 (5th Cir. 1997) ("[I]t seems exactly backwards that experts who purport to rely on general . . . principles and practical experience might escape screening by the district court simply be stating that their conclusion were not reached by any particular method or technique.  The moral of this approach would be, the less factual support for an expert's opinion, the better.")).  Absent a showing of reliability, "a court may conclude that there is simply too great a gap between the data and the opinion

proffered." Oddi, 234 F.3d at 146 (quoting Joiner, 522 U.S. at 146).

Farber also relies on his experience and general knowledge. However, the Court is not provided with any methodology to support Farber's opinions. While the Court is aware that the inquiry must be a flexible one, the Court must still evaluate the reliability of an expert's opinion. Here, there is little more than Farber's own opinion to suggest that Meyers's development of ALS was caused by trauma. Therefore, the analytical gap between the studies suggesting an association of trauma with the onset of ALS and Farber's opinion that trauma causes ALS is simply too great.

### 3. Differential diagnosis and temporal relationship

The Third Circuit has held that "[w]hen the temporal relationship is strong and is part of a standard differential diagnosis, it would fulfill many of the Daubert/Paoli factors"; however, "it is within the court's province to ensure that the conclusion, particularly a medical expert's ultimate conclusion on causation, 'fits' with the data alleged to support it." Heller, 167 F.3d at 158 (citing Paoli, 35 F.3d at 742 n.8). In Heller, the plaintiffs argued that the carpeting installed in their home, and manufactured by the defendant, contained VOCs, which caused them to suffer severe respiratory problems. Id. at 149. Plaintiffs' expert relied on a differential diagnosis and the temporal relationship between installation of the carpet and the onset of the plaintiffs' symptoms. Id. The court affirmed the district court's exclusion of the expert's opinion because it found the temporal relationship questionable. Id. at 158. The court reasoned

the temporal relationship did not support the reliability of the expert's opinion because the illness of one plaintiff pre-dated the installation of the new carpet and the other plaintiff did not become symptomatic until well after[2] the installation of the new carpet. Id.

Meyers argues that Farber's methodology, absent his reliance on published studies, was similar to the differential diagnosis and temporal relationship approach espoused in Heller. However, like the expert there, the temporal analysis here is, at best, questionable. Belsh testified that the incubation period for ALS is unknown, but not fewer than one year and as much as ten years. (Daubert Hearing Trans., p. 29:12-16; 40:1-25; 41:1-25.) Belsh reasoned that "[i]t has been known for some time that clinical disease in ALS is not recognized until about 50% of the motor neurons at a particular level are dead. Therefore, biological onset of disease must precede clinical onset by several years." Expert Report of Belsh, p. 5. In addition, Farber testified that the studies on which he relied look for a period of time between the trauma and the onset of ALS for as long as three, and up to five, years. (Daubert Hearing Trans., p. 83:10-11; 83:23-24.) In this case, only eight months elapsed between the incident and the onset of ALS symptoms. Therefore, the Court finds that Farber's conclusion on causation does not fit with the data cited in support.

---

[2] The plaintiff's expert testified that symptoms would appear within twenty-four hours of exposure to the VOCs; however, plaintiff's symptoms did not appear for at least two weeks after the installation of the new carpet. Heller, 167 F.3d at 157.

## CONCLUSION

Based on the foregoing, Defendant's Motion in Limine [12] to exclude that portion of Farber's testimony that relates to the causal link between trauma and the onset of ALS will be granted.

                                        /S/ Joseph H. Rodriguez
                                        JOSEPH H. RODRIGUEZ, U.S.D.J.

Dated: December 20, 2005